## Michael J. Kenna, Appellee, v. Calumet, Hammond & Southeastern Railroad Company, Appellant.

### Gen. No. 21,961.

1. COURTS, § 158*—what federal court decisions are binding on State courts. The conclusions reached in regard to federal questions by federal courts inferior to the United States Supreme Court, while persuasive, are not binding on State courts, but in the consideration of such questions the State courts are bound only by the decisions of the United States Supreme Court.

2. CARRIERS, § 14*—what duties assumed by organizing under Railroad Act. By organizing under the general Railroad Act (J. & A. ¶ 8735 et seq.), the duty is assumed of serving the public as a common carrier, without discrimination and subject to the Legislature's regulatory power.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

3. CARRIERS, § 4*—*what is test of railroad's status as common carrier.* The test of a railroad's status as a common carrier is its powers and duties with regard to the public, not the extent to which the public uses its facilities.

4. CARRIERS, § 4*—*when railroad is common carrier.* A railroad company chartered under the general Railroad Act (J. & A. ¶ 8735 *et seq.*) is a common carrier, even though it is engaged solely in receiving from other roads and delivering consignments made to a particular plant and in receiving from such plant and delivering to other roads shipments regardless of their destination, and is not to be considered a mere plant facility.

5. COMMERCE, § 4*—*when railroad is engaged in interstate commerce.* A railroad company organized under the Railroad Act (J. & A. ¶ 8735 *et seq.*) and having its lines wholly in the State is engaged in interstate commerce, where it receives from interstate lines cars containing shipments consigned to a particular plant and delivers them to such plant and receives from such plant cars, without regard to their final destination, and delivers them to connecting lines.

6. MASTER AND SERVANT, § 689*—*when evidence is sufficient to show that car coupler is defective.* In an action by a switchman to recover for injuries alleged to have been caused by the failure of the carrier employing him to provide a coupler conforming to the requirements of the Federal Safety Appliance Act, a finding of the jury that the coupler was defective or failed to conform to the requirements of the act, *held*, under the evidence, not manifestly contrary to the weight of the evidence.

7. MASTER AND SERVANT, § 147*—*when not essential that either carrier or employee be engaged in interstate commerce at time of injury.* To entitle an employee to recover for an injury alleged to have been caused by the carrier's failure to comply with the requirements of the Federal Safety Appliance Act, it is not essential that, at the time the injury was received, either he or the carrier should have been actually engaged in interstate commerce.

8. MASTER AND SERVANT, § 302a*—*when assumed risk is not defense.* In an action to recover under the Federal Safety Appliance Act for injuries alleged to have been caused by a failure to comply with the act, where a failure of the carrier to comply with the requirements of the act is shown, it cannot be set up that the employee assumed the risk of injury from such failure.

9. MASTER AND SERVANT, § 430*—*when contributory negligence is not defense.* In an action to recover under the Federal Safety Appliance Act for injuries alleged to have been caused by a failure to comply with the act, where a failure of the carrier to comply with

Kenna v. Calumet, Hammond & Southeastern R. Co., 206 Ill. App. 17.

the requirements of the act is shown, plaintiff's negligence is not a defense.

10. APPEAL AND ERROR, 1514*—*when statements of counsel do not constitute reversible error.* In an action to recover for injuries causing the loss of plaintiff's arm, statements of counsel that he represented a one-armed man, *held* not ground for reversal.

11. WITNESSES, § 224*—*what is proper cross-examination.* In an action by an employee to recover for personal injuries, plaintiff's counsel may, on cross-examination of another employee who had testified for defendant as to a statement made by plaintiff immediately after the injury, show the circumstances connected with the procuring of the statement and the zeal of the witness in obtaining it.

12. APPEAL AND ERROR, § 473*—*when objection to comments of counsel are too late.* Objection to comments of counsel cannot first be made on appeal.

13. APPEAL AND ERROR, § 1247*—*when comments of counsel for plaintiff in action for personal injuries may not be complained of.* In an action for personal injuries, comments of plaintiff's counsel and his conduct in examining witnesses, *held* not reversible error, especially where the remarks and conduct of the opposing counsel were equally objectionable.

14. TRIAL, § 123*—*what argument of counsel is improper.* Statements of counsel in arguing a cause as to their belief with regard to the merits of plaintiff's cause of action or of defendant's defenses are improper.

15. MASTER AND SERVANT, § 799*—*when instructions are correct.* In an action by a servant to recover for personal injuries, instructions examined and *held* to state the law correctly.

16. WORKMEN'S COMPENSATION ACT, § 12*—*when instruction on applicability of in action at law is properly refused.* In an action to recover for personal injuries brought under the Federal Safety Appliance Act, the refusal to instruct that the Workmen's Compensation Act applies if the parties were not engaged in interstate commerce at the time is proper.

17. INSTRUCTIONS, § 93*—*when instruction directing jury to disregard testimony of witnesses is properly refused.* An instruction directing the jury to disregard the testimony of the witnesses of the other party, *held* properly refused as misleading.

18. EVIDENCE, § 267*—*when switch order receipt is admissible.* In an action by an employee to recover under the Federal Safety Appliance Act, a switch order receipt produced by defendant's agent from its files showing the time of the receipt of a car is competent, as a record of defendant, on the question as to whether

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

such car was destined for another State, where the agent producing the receipt testified to facts showing that it was made by him, sent out to connecting lines, and by them returned to defendant's files, and where the employee of the connecting line receiving the car testified that the receipt was correct, that he signed it and the car was delivered at the time stated and the bills were returned to defendant.

19. APPEAL AND ERROR, § 1489*—*when erroneous admission of evidence is harmless.* Error in admitting a document in evidence is harmless if the matter sought to be established thereby is shown by other and competent evidence.

20. EVIDENCE, § 164*—*what papers and reports are admissible as entries against interest.* In an action under the Federal Safety Appliance Act, on the question as to whether the train causing the injury contained a car destined for another State, switching reports, transfer bills and train reports of defendant and the connecting line handling the train are admissible as entries against interest made in the regular course of business by persons charged with a public duty to make them.

21. EVIDENCE, § 221*—*what does not constitute hearsay.* The admission of evidence of an entry of record, made in the regular course of business or in the discharge of a duty, is not objectionable as the admission of hearsay.

22. EVIDENCE, § 315*—*what weight given to entries in record made in course of business or in discharge of duty.* The weight to be given evidence of an entry of record, made in the regular course of business or in the discharge of a duty, depends upon circumstances.

23. EVIDENCE, § 296*—*when train reports are admissible.* In an action under the Federal Safety Appliance Act, on the question as to whether the train causing the injury contained a car destined to another State, train reports of defendant and the connecting line receiving the train, made in the regular course of business and in the performance of duty, are admissible, even though the one making the report is not shown necessarily to have had personal knowledge of the fact recorded where such person testifies that the report is correct.

24. TRIAL, § 78*—*what is proper rebuttal evidence.* Certain evidence as to the custom with regard to the delivery by defendant of cars to connecting lines, *held* properly admissible as rebuttal.

25. DAMAGES, § 131*—*when verdict in favor of switchman for personal injuries is not excessive.* In an action to recover for personal injuries resulting in the loss of his left hand, where the evidence shows that, at the time of the accident, plaintiff was fifty-one

Kenna v. Calumet, Hammond & Southeastern R. Co., 206 Ill. App. 17.

years of age, was a switchman receiving about $100 a month, that he had been practically unable to find employment since the accident, that his loss in wages, at the time of the trial, amounted to $3,000, and that he endured great pain and suffering, a verdict for $10,000 is not excessive.

ADDITIONAL OPINION UPON APPLICATION FOR CERTIFICATE OF IMPORTANCE AND APPEAL.

1. CONTRACTS, § 135*—*when are contrary to public policy and void.* In the absence of legislative sanction, contracts between parties for the purpose of relieving one or the other, wholly or in part, from the legal consequences of future tortious or illegal conduct are contrary to public policy, and void.

2. MASTER AND SERVANT, § 98*—*when Legislature may make alterations in rights, liabilities and modes of compensation.* While Legislatures may by statute sanction contracts substituting new remedies for those existing, and may even alter rights, liabilities and modes of compensation for injuries to employees without the consent of either party, they can only give legislative sanction to a contract or make such alterations in the rights, liabilities and modes of compensation where those matters come within the scope of legislative authority.

3. MASTER AND SERVANT, § 98*—*what is effect of Workmen's Compensation Act on liability under Federal Safety Appliance Act.* It is wholly beyond the power of a Legislature to modify the consequences which would otherwise follow a violation of an act of Congress relating to interstate commerce, the Federal Safety Appliance Act, by the passage of a State Workmen's Compensation Act, and it is immaterial that the Safety Appliance Act does not, in terms, give the employee, or the party injured by its violation, a right of action, as the consequences that follow a breach of the law are vital and integral to its effect as a regulation of conduct and were clearly intended by Congress.

4. APPEAL AND ERROR, § 650*—*when review by certificate of importance not allowed.* Review by a certificate of importance is primarily provided for cases not otherwise reviewable, and will ordinarily be denied where application can be made to the Supreme Court for a writ of certiorari.

Appeal from the Circuit Court of Cook county; the Hon. JOHN GIBBONS, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1915. Affirmed. Opinion filed May 31, 1917. Additional opinion upon application for certificate of importance and appeal filed June 19, 1917.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

F. J. CANTY and P. L. McARDLE, for appellant; RYAN, CONDON & LIVINGSTON, of counsel.

JAMES C. McSHANE, for appellee.

MR. JUSTICE GOODWIN delivered the opinion of the court.

Appellant seeks to reverse a judgment against it for $10,000, recovered by appellee on account of the loss of his left hand while attempting to adjust a coupler on a car operated by appellant. The case went to the jury on a count which set out that appellant was a common carrier engaged in moving interstate traffic; that appellee was employed by it in connection with such commerce as a switchman; that appellant, contrary to the United States statutes, had in use upon its railroad in moving interstate traffic a car equipped with a certain automatic coupler of such improper construction, and in such a defective and inoperative condition, that it could not be coupled from the side of the car without the necessity of a man going between the end of the car and the car to which it was to be coupled, and in consequence, while the appellee was being so employed as a switchman in interstate commerce, he went between the ends of the cars and attempted to adjust the coupler, and while so doing, and while in the exercise of ordinary care for his own safety, his hand was caught and crushed between the couplers; and also upon a second count based upon his injury while appellee and appellant were engaged in interstate commerce, and while he was in the exercise of ordinary care for his own safety. The pleas to these counts were the general issue, and special pleas denying that appellant was a common carrier or engaged in interstate commerce, and setting out that the accident was governed by the Illinois Workmen's Compensation Act. To these special pleas

the appellee replied that appellant was a common carrier by railroad, and was engaged in interstate commerce between the States, and that appellee was at the time engaged in commerce between the several States.

The record disclosed that appellant was organized June 16, 1906, as a railroad corporation under an Act of the Illinois Legislature entitled "An Act to provide for the incorporation of associations that may be organized for the purpose of constructing railways, maintaining and operating the same," etc. The articles of incorporation provided that "The proposed railroad shall be constructed on the following routes: 1st. Commencing at some point in the City of Chicago, Cook County, Illinois, North of Lake Calumet and running thence Southerly along a line East of said Lake Calumet and thence Southeasterly to a line between the States of Illinois and Indiana. 2nd. Also Commencing at some point on the line above described East of said Lake Calumet and running thence Northeasterly across the Calumet River to the shore of Lake Michigan." It further appears that appellant operated about five miles of track, including switch tracks, and owned and operated three locomotive engines; the track was standard gauge and the engines were standard. With each engine there was a crew consisting of engineer, fireman, conductor and two switchmen. Appellee was a switchman in the employ of appellant. The railroad is situated partly in and partly outside of the plant commonly known as the By-Products Coke Corporation, and connects with two railroads directly, one known as the New York, Chicago & St. Louis, and the other known as the Belt Railroad of Chicago; it had three delivery tracks to the Belt Railroad, and delivered to the Belt Railroad, the Monon and the Wabash. Appellant was accustomed to receive about one hundred cars a day, and they came from various parts of the country; the cars sent out by it were billed

to various points both within and outside of the State. It received cars from various railroads, and it delivered all the cars received by the Coke Company, and delivered to other railroads all the cars sent out by that company. On the day in question various cars were taken out over the line of appellant, destined to various places, including a car shipped to Michigan City, Indiana. The railroad crosses a street known as Torrence avenue; the five miles of track included the switch tracks, but the delivery tracks were not included. Its trains and engines did not go beyond the delivery tracks, and its engines never went to Wisconsin or Indiana; the entire switching crews consisted of fifteen men, and from thirty-five to forty men were employed by the railroad. When a car is shipped from the Coke Company to Milwaukee, it is delivered to the Belt Railroad, which, in turn, delivers it to the Chicago, Milwaukee & St. Paul Railroad, and the latter delivers the car at Milwaukee. Appellant's charge for such a delivery to a connecting carrier is $3, and the Belt Railroad's charge is $6; the Coke Company pays appellant. At the time of the accident, which happened June 6, 1912, appellant received a part of the through rate. On cross-examination, a witness employed by the appellant and called by the appellee stated that the railroad was not now permitted to make any charge against a connecting carrier for freight going outside of the State, but at the time of the accident, it made its charges differently.

From this and other evidence it may be inferred that appellant received from other railroads all consignments made to the By-Products plant in question, and delivered them to the By-Products Company; that it also received from the By-Products Company all railroad shipments regardless of their final destination, and delivered them to connecting carriers, and did not, in fact, carry the goods of any shippers except the

By-Products Company and the various shippers making consignments to it, and that its facilities did not make it practical for it to do so.   In this state of the record, appellant vigorously contends that it was not a common carrier, and was not engaged in interstate commerce, but that its railroad and equipment constituted a mere plant facility belonging to the By-Products Company.   It further insists that in the determination of this question this court is bound by the decisions of the federal courts, so far as they are applicable.   If by this counsel mean (and apparently they do) that we are bound by the decisions not only of the United States Supreme Court, but also of the inferior federal tribunals, we are unable to sustain their contention.   In providing a system of federal judicature, the Constitutional Convention of 1787 first adopted a resolution which would have vested it exclusively in the Supreme Court of the United States and inferior federal tribunals.   The provision in regard to inferior federal courts was, however, stricken out for the reason that it was thought that in the interest of economy all original federal jurisdiction should be left to the State courts.   While a compromise was effected which left the creation of inferior federal tribunals to the discretion of Congress, that body, when organized, adopted, and has since adhered to, a policy of conferring jurisdiction on inferior federal courts in a limited portion of the cases falling within the Nation's judicial power, while leaving a large, if not the greater, portion to be determined by the tribunals created and maintained by the States—an arrangement greatly to the financial advantage of the federal government.   It thus transpires that the State courts are, in fact and by intention, an integral part of the federal system of judicature, and exercise exclusive original jurisdiction in many, and, with one exception, concurrent jurisdiction in all the remaining federal civil

causes, subject as to the latter to a power of removal in certain instances. We are of the opinion, therefore, that the conclusions reached in regard to federal questions by the federal tribunals inferior to the United States Supreme Court, while persuasive, are not binding upon us, but that in the consideration of such questions the State courts are bound only by the decisions of the United States Supreme Court. We think that our Supreme Court had this in mind when in *Staley v. Illinois Cent. R. Co.*, 268 Ill. 356, speaking through Mr. Justice Carter, it said, with reference to a federal question: "We have referred to and commented on practically every decision of the United States Supreme Court bearing upon this question. The decisions from other courts could not be controlling, and, at most, only persuasive." The earlier statement of our Supreme Court in *Luken v. Lake Shore & M. S. Ry. Co.*, 248 Ill. 377, at page 383, that, "In construing a federal statute this court is bound by the construction placed upon the act by federal courts," was obviously a dictum, in view of the fact that in that case the court held that, "The construction placed upon the federal statute by the federal courts is the sound and proper construction, and in the absence of federal authority we would give the State statute the same construction that the federal courts have given the federal statute, by holding that the duty imposed upon the carrier to equip and maintain safety appliances in such condition and state of repair that they will operate in the manner and for the purposes intended is absolute, and the carrier cannot be heard to say in defense of an action brought by one injured in consequence of its failure to perform its duty, that the plaintiff is bound to prove that the carrier did not exercise reasonable care to maintain the safety appliances in good condition and repair."

It is, then, with this principle in view, that we must decide whether, in view of the facts disclosed by the

record, appellant was a common carrier. It will be noted that appellant, by organizing under the general Railroad Act, assumed a duty to serve the public as a common carrier, without discrimination, and subject to the full regulatory power vested in the General Assembly. As such it became its duty to accept shipments of any goods which any railroad or any shipper might present to it for carriage, and it was, at the time of the accident, performing this duty so far as its facilities permitted. It was obliged to and did receive shipments from every line with which it was connected; it could lawfully be compelled to establish depots for the receipt and distribution of freight, and it was authorized to exercise the sovereign power of eminent domain. What the Interstate Commerce Commission and the federal courts may have said in regard to the right of similar lines to participate in the division of a through rate is not material in determining the character of the appellant; the essence of what was said in those cases was that the service performed by the petitioner was something in addition to the service contemplated and covered by the through rate, and that, in consequence, the company performing the additional service was not entitled to a division of that rate. The true test of whether a corporation is or is not a common carrier seems to us to be succinctly stated by the United States Supreme Court in its opinion in the *Tap Line Cases*, 234 U. S. 1, cited by appellant, in which the court said, at page 24:

"It is insisted that these roads are not carriers because the most of their traffic is in their own logs and lumber, and that only a small part of the traffic carried is the property of others. But this conclusion loses sight of the principle that the extent to which a railroad is in fact used does not determine the fact whether it is or is not a common carrier. It is the right of the public to use the road's facilities and to demand service of it rather than the extent of its busi-

28    APPELLATE COURTS OF ILLINOIS.

Kenna v. Calumet, Hammond & Southeastern R. Co., 206 Ill. App. 17.

ness, which is the real criterion determinative of its character. This principle has been frequently recognized in the decisions of the courts."

At page 26, the court further said:

"Furthermore, these roads are common carriers when tried by the test of organization for that purpose under competent legislation of the State. They are so treated by the public authorities of the State, who insist in this case that they are such, and submit in oral discussion and printed briefs cogent arguments to justify that conclusion. They are engaged in carrying for hire the goods of those who see fit to employ them. They are authorized to exercise the right of eminent domain by the State of their incorporation. They were treated and dealt with as common carriers by connecting systems of other carriers, a circumstance to be noticed in determining their true character. *United States v. Union Stock Yard & Transit Co.*, 226 U. S. 286. They are engaged in transportation as that term is defined in the commerce act and described in decisions of this court."

We are of the opinion that, under the reasoning of the United States Supreme Court, the appellant in this case was, as a matter of law and in any view of the evidence, a common carrier, and that the trial judge did not err in so instructing the jury. If, then, it was a common carrier, it necessarily follows that as there is abundant evidence that it was constantly engaged in the movement of cars destined to points outside of the State and consigned from points outside of the State, it was a common carrier engaged in interstate commerce.

As this disposes of the issues raised by the special pleas relating to the nature of the appellant corporation, it now becomes necessary to consider the question of whether the evidence was sufficient to sustain a verdict under either of the counts in the declaration upon which the case was submitted to the jury. As we have already noted, the first count was

based upon an alleged failure to comply with the Federal Safety Appliance Act, and upon the provisions of the Federal Employers' Liability Act.   Appellant contends that neither act gives a right of action in the present case, while appellee claims that it may be sustained at least under the Federal Safety Appliance Act.   The section of the original Safety Appliance Act relied upon here was as follows:

"Sec. 2.    That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."   (Section 2, p. 3174 of the U. S. Compiled Statutes of 1901, vol. 3.)

While it will be seen that the application of the act as originally passed was limited to "any car used in moving interstate traffic," by the terms of the amendatory act of March 2, 1903, its application was extended by the provision that "the provisions and requirements of the Act    *    *.    *    shall apply in all cases, whether or not the couplers brought together are of the same kind, make, or type; and the provisions and requirements hereof and of said Acts relating to train brakes, automatic couplers, grab irons, and the height of drawbars shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce," etc.   The record here discloses, as we have already held, that the appellant was a common carrier engaged in both intra and interstate commerce. The evidence further shows that appellee, a switchman employed by appellant, went, in the course of his duty, between two cars for the purpose of adjusting the coupling pin of an automatic coupler which had failed to work.   There is a decided conflict of testimony as to whether the coupler in question was or was

not defective, but a careful scrutiny of the evidence fails to convince us that the finding of the jury, that it was defective or failed to measure up to the standard required by the statute, was manifestly contrary to the weight of the evidence. It is contended, however, that the appellee assumed the risk resulting from the manner in which the work was being carried on, and also that he was guilty of negligence which was the proximate cause of the accident, and also that he cannot recover because it was not shown that either the appellee or appellant was at the time of the accident engaged in interstate commerce. Subsequent to the filing of appellant's brief in this case, two opinions were handed down by the United States Supreme Court, which, in our view, conclusively dispose of these contentions. In the first of these, *Texas & P. Ry. Co. v. Rigsby,* 241 U. S. 33, the defendant in error, while in the employ of the plaintiff in error as a switchman, was engaged in taking some bad order cars to the shop; he fell, owing to a defect in one of the handholds or grabirons. The court, speaking through Mr. Justice Pitney, say, at page 37:

"It is earnestly insisted that Rigsby was not under the protection of the Safety Appliance Acts because, at the time he was injured, he was not engaged in interstate commerce. By section 1 of the 1903 amendment its provisions and requirements and those of the Act of 1893 were made to apply 'to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce * * * and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith,' subject to an exception not now pertinent. And by section 5 of the 1910 amendment the provisions of the previous acts were made to apply to that act, with a qualification that does not affect the present case. In *Southern Ry. v. United States,* 222 U. S. 20, which was an action to recover penalties for a violation of the acts with respect to cars some of which were moved in intrastate traffic, and not in connection with any car or cars

used in interstate commerce, but upon a railroad which was a part of a through highway for interstate traffic, it was held that the 1903 amendment enlarged the scope of the original act so as to embrace all cars used on any railway that is a highway of interstate commerce, whether the particular cars are at the time employed in such commerce or not.''

The court further said, page 38:

''It is argued that the authority of that case goes no further than to sustain the penal provisions of the act, and does not uphold a right of action by an employee injured through a violation of its provisions, unless he was engaged in interstate commerce. That the scope of the legislation is broad enough to include all employees thus injured, irrespective of the character of the commerce in which they are engaged, is plain.  *   *   *   A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law expressed in 1 Com. Dig., title, 'Action upon Statute' (F), in these words: 'So, in every case, where a statute enacts or prohibits a thing for the benefit of a person, he shall have a remedy upon the same statute for the thing enacted for his advantage, or for the recompense of a wrong done to him contrary to the said law.' ''

At page 40, the court say:

Plaintiff's injury was directly attributable to a defect in an appliance which, by the 1910 amendment, was required to be secure, and the act must therefore be deemed to create a liability in his favor, unless it be beyond the power of Congress under the commerce clause of the Constitution to create such a liability in favor of one not employed in interstate commerce.''

The court then holds that such a remedy was within the Constitutional powers of Congress. At page 43, the court further say:  .

''The question whether the defective condition of the ladder was due to defendant's negligence is imma-

terial, since the statute imposes an absolute and unqualified duty to maintain the appliance in secure condition.  *  *  *

"Of course, the employee's knowledge of the defect does not bar his suit, for by section 8 of the Act of 1893, an employee injured by any car in use contrary to the provisions of the act is not to be deemed to have assumed the risk, although continuing in the employment of the carrier after the unlawful use of the car has been brought to his knowledge; and by section 5 of the Act of 1910 the provisions of the 1893 act are made applicable to it, with a qualification that does not affect remedial actions by employees."

In the second case, *San Antonio & A. P. Ry. Co. v. Wagner*, 241 U. S. 476, the plaintiff, employed as a brakeman upon a line engaged in both interstate and intrastate commerce, was injured while attempting to shove the knuckle of a coupler on an engine so as to bring it into proper position to make a coupling. It did not appear whether the defendant was at the time engaged in interstate commerce or not. The court, in their opinion, again speaking through Mr. Justice Pitney, say, at page 482:

"There was sufficient evidence to warrant the jury in finding that the coupler upon the box car or that upon the engine, or both, were in bad repair, and that for this reason they did not measure up to the standard prescribed by the Act of March 2, 1893, for such equipment, viz.: 'Couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.' This standard was, by the first section of the 1903 amendment, made to apply 'in all cases, whether or not the couplers brought together are of the same kind, make, or type;' and was extended to 'all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce,  *  *  * and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith,' subject to an exception not now material. As has been held repeat-

edly, this amendment enlarged the scope of the original act so as to embrace all locomotives, cars, and similar vehicles used on any railway that is a highway of interstate commerce, whether the particular vehicles are at the time employed in interstate commerce or not. *Southern R. Co. v. United States,* 222 U. S. 20, 26; *Texas & P. Ry Co. v. Rigsby,* 241 U. S. pp. 33, 37.

"That the act requires locomotives to be equipped with automatic couplers, and that its protection extends to men when coupling as well as when uncoupling cars, are points set at rest by *Johnson v. Southern Pac. Co.,* 196 U. S. 1, 15, 18."

At page 484, the court say:

"We need not in this case determine, what was conceded in *Chicago, R. I. & P. Ry. Co. v. Brown,* 229 U. S. 317, 320 [3 N. C. C. A. 826], that the failure of a coupler to work at any time sustains a charge that the act has been violated.

"It is argued that in actions based upon the Employers' Liability Act the defendant cannot be held liable without evidence of negligence, *Seaboard Air Line v. Horton,* 233 U. S. 492, 501 [8 N. C. C. A. 834], being cited. But in that case, as the opinion shows (p. 507), there was no question of a violation of any provision of the Safety Appliance Act; and in what was said (p. 501) respecting the necessity of showing negligence, reference was had to causes of action independent of that act."

The court then cites with approval the quotation already made from *Texas & P. Ry. Co. v. Rigsby, supra,* and then continues:

"If this act is violated, the question of negligence in the general sense of want of care is immaterial."

The court concludes by saying:

"In various forms plaintiff in error raises the contention that it was plaintiff's improper management of the coupling operation that was the proximate cause of his injury. But any misconduct on his part was no more than contributory negligence, which, as already shown, is by the Employers' Liability Act excluded from consideration in a case such as this."

As already indicated, we think that in the instant case there was ample evidence to justify the jury in concluding that the coupler in question failed to measure up to the standard set by the statute, and that this fact was the proximate cause of appellee's injury.

For appellant it is claimed that there was misconduct on the part of appellee's attorney of such a character as to amount to reversible error, and a number of incidents appearing in the record are cited which it is claimed justify that conclusion. For the appellee it is suggested that the trial lasted fifteen days, and the record contains some 1,075 pages; that the remarks themselves were, in each case, justified, and that appellant's attorney himself was guilty of similar misconduct. The first matter complained of is that appellee's attorney did on two occasions refer to the fact that he was representing a one-armed man. The loss of appellee's arm was, however, the very injury sued for, and we do not think the statements made were of a kind to inflame the prejudices of the jury; they were in reply to criticisms of counsel, and amounted to no more than statements that counsel was not representing his own interest or consulting his own feelings in the manner in which he was conducting the trial, but that he owed a duty to his client who had suffered the serious injury in question. The cross-examination of the witness Sprague is relied upon as improper, but we think it was within counsel's right to show if he could, by proper cross-examination, that the witness had zealously sought and obtained for his employer the statement of appellee immediately after his hand had been crushed and while he was in a bleeding condition lying upon a stretcher. Every circumstance connected with the manner in which the statement was obtained, and the witness' zeal in obtaining it, were proper matters for searching cross-examination. It is now objected that appellee's counsel several times referred to the witness Sprague as a claim agent, but

that objection was not made at the trial. It seems also that Sprague took the depositions of several witnesses, but, although he examined the witness Holland, no statement of his was produced, and appellee's counsel remarked, "He took everybody else's statement, why didn't he take this man's statement?" The inference sought to be made obviously was that the statement was unfavorable to appellant. We do not think that the inference is as appellant's counsel contend, that this was equivalent to an accusation that its methods were deceptive or that it was guilty of deception and dishonorable conduct, or that the other statements introduced in evidence were fabricated. Other minor incidents in the examination and cross-examination of witnesses by appellee's attorney are relied upon as erroneous, but in no case do they appear to amount to misconduct; but these and remarks of attorney for appellee now objected to, if they did amount to reversible error, could not be relied upon here for that purpose, in view of the equally objectionable remarks of appellant's attorney, noted in appellee's brief, for it is well settled that a party cannot complain of misconduct or remarks of opposing counsel if his own counsel was guilty of similar misconduct, or made similar remarks. (*Peyton v. Village of Morgan Park,* 172 Ill. 105.) The same is true of the objection made in regard to appellee's attorney's argument to the jury. It was, of course, improper for him to say that he believed his client had a good cause of action in that court, but this was called forth by the equally improper statement of the attorney for appellant, deliberately and almost solemnly made, to the effect that he believed not only that appellee had not proved his case by a preponderance of the evidence, but that he believed appellant had proved its innocence by a preponderance of the evidence. These were the ultimate questions for the jury's determination, and ap-

pellant's attorney's statement was not merely an argument, but rather professed to be the deliberate and well-weighed opinion of one presumably experienced in matters of evidence, as to where the preponderance of the evidence rested. The statements of the opposing attorneys were equally improper, but neither party has a right to complain of the improper conduct of the other in this regard.

We have carefully considered the instructions complained of by counsel for appellant, but are of the opinion that they correctly state the law and are free from the objections urged. The refusal of the court to instruct the jury that the State Compensation Act applied if the parties were not engaged in interstate commerce at the time of the accident, is correct, since there was evidence sufficient to sustain a verdict based upon the Safety Appliance Act, which applies in cases where neither party is, at the time, engaged in interstate commerce.

We think the instruction offered by appellant, that if the jury found that the north car was not the St. Paul car, they should disregard all evidence that the coupler on the south end of the St. Paul car was defective or inoperative, was properly refused. The testimony of appellee's witnesses was to the effect that the south coupler on the north car was defective, and that this was the St. Paul car. The jury had no right to disregard the testimony in regard to the condition of the south coupler on the north car, even though appellee's witnesses were mistaken in regard to its being the St. Paul car. The instruction tendered might well have misled the jury on this point.

Upon the question of whether or not the train in connection with which the accident happened contained a car destined for another State, appellee offered in evidence a train report showing that the car was received by the Belt Railroad Company at 4:00 p. m., and a switch order receipt stating that that car was

received àt 5:30 p. m., and a transfer bill. It is contended that the admission of these documents was improper. So far as the switch order receipt is concerned, it sufficiently appears that this document was produced by the appellant's agent, and from its files; that he made up the switch bill together with certain copies for different files and two for the connecting line; that they were all made with one impression; that they were sent to the connecting line in the regular course of business, and returned in the regular course of business, and placed in appellant's files. This establishes the fact that they were not the records of the connecting carrier, but the records of appellant itself, and properly admissible in evidence. But in addition to this, Mullaney, the yard clerk of the Belt line, testified that he signed the receipt in the regular course of business, and stated the thing correctly; that he signed it at 5:30 p. m.; that the car was delivered at that time at the Deering street station of the Belt Railroad, and he sent the bills back to the appellant in the regular course of business. In response to a question on cross-examination, "So, these way bills you made up at 5:30 in the afternoon; you don't know whether that is the time the cars came in or not, do you?" the witness answered, "The cars were shoved out at that time, or the time would not have been put down there '5:30 p. m.'" He further testified that 5:30 was the time that the car was delivered.

The train report and the transfer bill were records of the Belt line, and not of the appellant. The former's agent produced three original train reports which included all the cars delivered to the Belt Railroad that day. The two morning reports of seven o'clock and eleven o'clock were admitted in evidence by consent; the latter was objected to. The question in dispute was as to the hour when the Haskell & Barker car, destined for Michigan City, Indiana, was received

by the Belt line on June 6th. The fact that it was received is not in dispute. The train report did not state or purport to state the time or hour at which the train was delivered; it did tend to show that the twenty cars mentioned therein were included in one train. As this was otherwise established, the admission of the document, if improper, was harmless error. The transfer bill showed that the car in question was received by the Belt Railroad at 4:00 p. m.; the clerk making this record was produced, and testified that he had then no recollection in regard to the matter except that the entry was in his handwriting; he did not recall whether he got the information from the way bills or from some other source, or whether he obtained it by telephone. It does sufficiently appear, however, that he made the entry in the regular course of business, and as the result of a duty to his employer. Both employees making these records testified that they knew the facts recorded at the time, and that they recorded them correctly, and would not have done so if they had not been correct. We think that in any event the switching reports, transfer bills and train reports were all admissible upon the broad and well-established ground that the entries were made in the regular course of business by persons charged with a duty to make them. It may be noted, although in view of the trend of decisions it is not an indispensable fact, that the Belt Railroad Company was engaged in the performance of a public duty, and that in connection therewith it was necessary to keep accurate records of the time when cars were received. The well-known fact that cars of different railroads are constantly interchanged, and also that the receipt of a car charges the carrier with responsibility for its safe transportation, rendered these entries, made in the regular course of business and in discharge of a public duty, also entries against interest. The admission of evidence of an entry of record, made in the regular

Kenna v. Calumet, Hammond & Southeastern R. Co., 206 Ill. App. 17.

course of business or in the discharge of a duty is, in reality, not an exception to the hearsay rule. Such an entry constitutes an affirmative act of the party making it, and where there is every inducement to make it accurately and correctly. The admission of the entry is, therefore, not the admission of hearsay testimony, or merely of an unsworn statement, but the very fact that the entry was made is, in itself, the strongest evidence that the event recorded actually happened. The weight to be given such evidence depends upon the facts and circumstances of each case, but its admissibility is strongly supported by authority. (See Wigmore on Evidence, secs. 1530 to 1660, both inclusive.) There is, moreover, a strong and logical tendency on the part of courts not to exclude evidence which in the ordinary transactions of life is considered to be of the most reliable character. No one could doubt, for instance, that if business men found it important to decide whether a car was received by a certain railroad and the time when it was received, they would consider the fact that the clerks charged with the duty of making out receipts and reports had made entries showing that it was received at a given hour, as evidence of a most persuasive kind. Counsel for appellant object to the train report on the further ground that it is not shown that the one entering the report necessarily had personal knowledge of the fact recorded, in the sense that he actually saw the car at the time it was received. Assuming that counsel's conclusion is correct, we do not think that the objection is tenable. His testimony is that the entries were correct, and it does not make any difference whether his information came from actually seeing the car, or whether it was gleaned from reports oral or written of others whose duty it was to inspect the cars and report the facts. This is a matter which is elaborately discussed in Wigmore on Evidence, sec. 1530. But aside from these considerations, it seems

clear that the fact that the switching report, train report and transfer bill charged the Belt Railroad with responsibility and liability for the car, rendered them entries against interest, and that, in consequence, they were unquestionably admissible upon that ground. It is contended by counsel for appellant that the reports were contradictory, but that, of course, would be a matter going to the weight and not to the admissibility of this evidence. We are not, moreover, in any way concerned about the question of whether the evidence was sufficient to justify the jury in finding that the car in question was a part of the train of cars in connection with which the accident occurred, for, in our belief, the evidence amply sustains the allegations in appellee's declaration, based on a failure to comply with the Safety Appliance Act, and it is, therefore, unnecessary to consider whether the evidence is sufficient to sustain a finding that appellee and appellant were engaged at the time in interstate commerce.

Appellant further claims that it was error to permit the introduction of evidence to show that the other crew making deliveries on the day in question were not accustomed to do so in the afternoon. This is first objected to because it was not properly rebuttal testimony, but even if it were not, we think it was obviously within the discretion of the trial judge to receive it. We think, however, it was proper rebuttal, for as the engineer of the crew in question testified for appellant that they did deliver cars every afternoon, it was proper for appellee to show, if he could, that this testimony was untrue. This disposes also of the contention that evidence of the custom is not competent, since the testimony in regard to what was customary was first presented by appellant, and raised an issue which appellee was entitled to meet.

Appellant finally contends that the amount allowed as damages was excessive. The evidence disclosed that appellee, at the time of the accident, was a switch-

Kenna v. Calumet, Hammond & Southeastern R. Co., 206 Ill. App. 17.

man some fifty-one years of age, and in receipt of from $17.50 to $25 a week, or about $100 a month; that he had been able to find practically no employment since the accident, and that his loss in wages at the time of the trial amounted in itself to some $3,000; that as a consequence of the accident he endured great pain and suffering. It is, of course, apparent that the damages flowing from such an accident are not susceptible of exact proof, and must be estimated, and that in such an estimate there must be taken into consideration the common experiences in the affairs of life. It would seem, therefore, that on such a question the judgment of twelve men called from various occupations, and consequently of varied experience, would, if honestly exercised, be more valuable than that of the court, but, in any event, we feel that we are not justified in saying that the allowance of the sum named, considering the matter of the pain and suffering and the loss of wages accurately shown up to the time of the trial, was excessive. In considering such a question, we are obliged to take notice of the obvious difficulty which a man engaged in such an occupation would have, at appellee's time of life, in securing employment. As there was evidence which would have justified the jury in finding that at the time of the trial appellee had suffered a financial loss of $3,000, an allowance of $7,000 in addition could not be held to be manifestly unjustified by the evidence if the jury had been confined to a consideration of appellee's pecuniary loss alone.

The judgment of the Circuit Court is affirmed.

*Affirmed.*

ADDITIONAL OPINION UPON APPLICATION FOR A CERTIFICATE OF IMPORTANCE AND APPEAL.

MR. PRESIDING JUSTICE GOODWIN delivered the opinion of the court.

In this application it is strenuously insisted on behalf of appellant that in this action no recovery can be had based upon a violation of the Federal Safety Appliance Act, for the reason that the parties have entered into a contract, in accordance with the terms of the State Workmen's Compensation Act, which determines the circumstances in which, and the extent to which, compensation shall be made by the employer to the employee. In the absence of legislative sanction, contracts between parties for the purpose of relieving one or the other, wholly or in part, from the legal consequences of future tortious or illegal conduct are contrary to public policy, and void. Legislatures, it is true, may by statute sanction contracts substituting new remedies for those theretofore existing, and may even alter rights, liabilities and modes of compensation for injuries to employees, without the consent of either party. *Workmen's Compensation* cases (*New York Cent. R. Co. v. White*, 243 U. S. 188, 13 N. C. C. A. 943; *Hawkins v. Bleakly*, 243 U. S. 210, 13 N. C. C. A. 959; *Mountain Timber Co. v. State of Washington*, 243 U. S. 219, 13 N. C. C. A. 927). But obviously they can only give such legislative sanction to a contract, or make such alterations in the rights, liabilities and modes of compensation, where those matters come within the scope of their legislative authority, and it is clear that it is wholly beyond the power of a State Legislature to modify the consequences which would otherwise follow a violation of an act of Congress in regard to interstate commerce, or to give effective sanction to any contract which attempts to do so. We think this is not only clear as an elementary principle of law, but definitely settled by the decision in *Texas & P. Ry. Co. v. Rigsby*, 241 U. S. 33, where the court say, at page 41:

"In the exercise of its plenary power to regulate commerce between the States, Congress has deemed it

Kenna v. Calumet, Hammond & Southeastern R. Co., 206 Ill. App. 17.

proper, for the protection of employees and travelers, to require certain safety appliances to be installed upon railroad cars used upon a highway of interstate commerce, irrespective of the use made of any particular car at any particular time. Congress having entered this field of regulation, it follows from the paramount character of its authority that State regulation of the subject-matter is excluded. *Southern Ry. Co. v. Railroad Commission of Indiana*, 236 U. S. 439. Without the express leave of Congress, it is not possible, while the federal legislation stands, for the States to make or enforce inconsistent laws giving redress for injuries to workmen or travelers occasioned by the absence or insecurity of such safety devices, any more than laws prescribing the character of the appliances that shall be maintained, or imposing penalties for failure to maintain them; for the consequences that follow a breach of the law are vital and integral to its effect as a regulation of conduct, liability to private suit is or may be as potent a deterrent as liability to public prosecution, and in this respect there is no distinction dependent upon whether the suitor was injured while employed or traveling in one kind of commerce rather than the other.''

We think the contention that this principle is not applicable here because the Safety Appliance Act does not, in terms, give the employee or the party injured by its violation a right of action, is wholly without merit. The United States Supreme Court has said that the consequences which shall follow a breach of the law are vital and integral to its effect as a regulation of conduct, and it is, therefore, plain that those consequences were in the minds of Congress, and intended. It is, therefore, impossible for the parties or for the Legislature to impair this act of Congress by taking away from it or modifying ''liability to private suit,'' which, as the Supreme Court has pointed out, ''may be as potent a deterrent as liability to public prosecution.''

Upon the merits of the application for a certificate of importance, it may be said that this method of review was provided primarily for cases not otherwise reviewable, and that, while there are exceptions to the general rule, we see no reason why the appellant in the instant case should not make its application to the Supreme Court for a writ of certiorari.

*Application for certificate of importance and appeal denied.*